UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| TREMOND THOMAS #624530 | CIVIL ACTION NO. 20-cv-1428 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| DARREL VANNOY | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Tremond Thomas ("Petitioner") was 15 when he and other young men entered a home to commit a burglary. Iesha Winbush, a resident of the home, was shot and killed during the course of the crime, which yielded a PlayStation PS3 that was pawned for about $100. A Bossier Parish jury convicted Petitioner of second-degree murder. The court sentenced him to life imprisonment with parole eligibility after 35 years. The conviction was affirmed on appeal. State v. Thomas, 201 So.3d 263 (La. App. 2d Cir. 2016), writ denied, 224 So.3d 980 (La. 2017). Petitioner then pursued a post-conviction application in state court.

He now seeks federal habeas corpus relief. His three habeas claims are rooted in the fact that the evidence against him included statements he made to police that Petitioner contends were taken in violation of his Miranda rights. Defense counsel Lee Harville filed a motion to suppress and argued, among other things, that Petitioner's mother invoked his right to silence mid-interview so that the police should have cut off questioning at that

point. The trial court denied the motion. Challenges to that ruling were rejected on appeal and in the post-conviction process.

Petitioner's federal habeas petition presents three claims: (1) a detective violated Petitioner's right to remain silent when his mother asked that questioning stop; (2) trial counsel rendered ineffective assistance of counsel because the motion to suppress did not specifically argue that the right to shut off questioning was contravened; and (3) appellate counsel rendered ineffective assistance by not briefing the alleged violation of the right to cut off questioning. For the reasons that follow, it is recommended that the petition be denied.

**Background Facts**

Taurus Carter used the proceeds of his mother's life insurance policy to purchase a home on Patton Street in Bossier City, and his girlfriend Iesha Winbush moved in with him. Mr. Carter testified that he and Ms. Winbush were eating dinner in their bedroom when someone knocked at the front door. Mr. Carter opened the door, and a young man asked if someone named John lived there. Carter told him that he had the wrong address. Another man suddenly jumped from the side of the house with a revolver and started shooting. Carter fled the house. He returned later and found Ms. Winbush in the bedroom in a puddle of blood. Carter also noticed that his gun was missing.

Police opened an investigation, and they initially suspected Mr. Carter of killing Ms. Winbush. During the investigation, Mr. Carter reported to police that a PS3 gaming device was missing from his home, and he provided the serial number. Police determined that Christopher Hicks had pawned the item shortly after the crime. Mr. Hicks told the police

that Petitioner, who was a friend of Hicks' stepson, gave him a backpack that contained the PS3, and Hicks pawned it. Hicks and the two boys split the proceeds.

Bossier City Police Officer Tiffani Brinkman was the lead investigator. She and Sgt. Barclay interviewed Petitioner on October 11, 2012. Brinkman said that Petitioner's mother, Trisa Thomas, arranged the meeting at the Calvary ball fields in Shreveport and was present for the interview. Brinkman read Petitioner his <u>Miranda</u> rights, and he and his mother signed a waiver form used for the interrogation of juveniles. A recording of the interview was played for the jury.

Brinkman began the October 11 interview by telling Petitioner that she wanted to talk to him about an incident involving a PS3. Petitioner told her that he and two others went to a house, found the door open, and took the PS3. He said they went to the house because his friend Randy said there was money there. Randy reportedly went in the bedroom and did not leave the house with Petitioner. Petitioner said that he had heard about a homicide, but he did not realize it happened at that house until police told him on the day of his interview.

The police continued their investigation and took three more statements from Petitioner over the course of the next day, October 12. Petitioner and his mother were again advised of his <u>Miranda</u> rights. Between the three interviews, police investigated Petitioner's claims and tried to corroborate or disprove his information. Petitioner said in the first October 12 interview that "Boosie" was with their group and had a gun; Petitioner thought Boosie killed the woman. The second October 12 interview also portrayed Boosie

as the gunman. Police learned Boosie's real name and determined that he was not involved in the homicide.

Petitioner changed his story in his third interview on October 12. He said that he, Randy, and Kentrell approached the house, and Randy had a gun. Randy fired a shot into the house, and the male occupant ran. Randy pointed his gun at the female resident and demanded money. He also ordered her to hand Petitioner a nearby gun. Petitioner said that he walked away, then heard several gunshots, so he ran out of the house. Petitioner stole the PS3 while he was there. He hid it for a time, then retrieved it and had it pawned. Petitioner said that he sold the stolen gun to someone named TJ. He admitted that he originally gave Boosie's name as the shooter because he wanted to blame someone other than his friend Randy.

**Motion to Suppress**

Defense counsel Lee Harville represented Petitioner at trial and on appeal. Harville filed a motion to suppress Petitioner's statements. The motion itself does not appear to be included in either Petitioner's filings or the certified complete record filed by the State. If it is in the record, the State has not cited to it in its memorandum. In any event, such motions are ordinarily just a few pages, short on details, and intended to be fleshed out at a hearing.

A lengthy hearing was held on the motion to suppress. Detective Brinkman and Petitioner's mother testified. The hearing and argument focused on whether the police afforded the proper <u>Miranda</u> warnings, whether Petitioner's statements were made

involuntarily in a coercive atmosphere, and whether Ms. Thomas invoked her son's right to silence mid-interview so that questioning should have ceased.

Detective Brinkman testified that she met with Petitioner and his mother on October 11 at the Calvary ball fields in Shreveport, a location suggested by Ms. Thomas because Petitioner was there for practice and it was convenient to Ms. Thomas' workplace. Brinkman presented Petitioner and his mother a form used in the interrogation of juveniles, allowed them a few minutes alone to read the form. The form advised Petitioner of his <u>Miranda</u> rights, including the right to ask for an attorney, the right to silence, and the right to stop answering questions. The detective then read the form to them verbatim to ensure that the rights were understood. Petitioner and his mother signed the form and agreed to the interview.

Detective Brinkman said that officers were then focused on confirming the history of the PS3 in an effort to verify or undermine statements made by Taurus Carter, who was the murder suspect at that time. The investigators initially believed that the murder and the PS3 burglary were unrelated. She asked Petitioner about how he came to possess the PS3 and how it was pawned.

Detective Brinkman testified that she contacted Petitioner's family the next day, October 12, because she wanted to talk to Petitioner again in an effort to clarify some points on which the investigation found inconsistencies between Petitioner's statement and a statement made by his friend Randy. Brinkman once again advised Petitioner and his mother of their <u>Miranda</u> rights on a new form. She read the form "word for word," stepped out of the room for several minutes, and returned. Petitioner and his mother signed the

form, and Petitioner gave the first of his statements in which he suggested Boosie was the gunman. Tr. 120-55.

After a few minutes of questioning, during which Petitioner described being in the house and hearing the victim scream, Petitioner's mother began talking to Detective Brinkman. It is this discussion that Petitioner argues was an invocation of his right to cut off questioning and remain silent. The discussion was:

| | |
|---|---|
| Mother: | Excuse me. |
| Q: | Yes ma'am. |
| Mother: | Is he fixing to go to jail? |
| Q: | I can't answer that question. |
| Mother: | Cause I can't stand to hear anymore (sic) of this. |
| Q: | Can I continue to talk to him? |
| Mother: | I need to help him (crying). |
| Q: | Can I continue to talk to him? |
| Mother: | If he's going to jail, can he go? |
| Q: | I don't have that answer yet for you ma'am. Mrs. Thomas, I, I'm being honest with you. I don't have that answer because -- |
| Mother: | I don't want to hear anymore (sic) of this. It's- |
| Q: | Can I, okay, can I continue to talk to him? |
| Mother: | I'm ready to go and get away from here if he's going to jail. Can he go? |
| Q: | I, I just need you to tell me if I can keep talking to him. |
| Mother: | UNINTELLIGIBLE. |

Q: He is by far being extremely helpful and that is what I need right now okay.

Mother: And I understand, it's just that, I mean I understand your job, but for me as a parent or brother or sister, I don't want to hear this.

Q: I, I am, as a mother I can appreciate what you're saying. Okay, I would like to continue to talk-

Mother: I was sitting here trying to hold back so he could finish but I just, I mean I-

Q: I, I tell you what, can I put you right outside the door? That way you're still here, but you're not sitting right here? And, and if you'll let me continue to talk to him-

Mother: I just want it to be over with so I can, I can be done. I mean I need to, I need to be through with this and gone. I, just, this is too much. I don't want to stand outside the door when I want it to be over with.

Q: But, but, I, I still need to get a few, I need, I, I need some more from him. Mrs. Thomas, I need some more from him please. And that's why I'm saying, if you want to sit right outside my door then, then you're still-

Mother: I don't want to sit outside the door.

Q: Okay then I, I don't know what other choice, because I still need to talk to him. I, I get where you're coming from as a mom I do, I do because I, I can't imagine. My heart goes out to you. And I mean that sincerely. And I don't care how old they are, they will always be our babies. But, but what comes out of his mouth right now is gonna determine a lot, Mrs. Thomas, it's gonna determine a lot. Which road we go down from here because he's either gonna be an accomplice or he's gonna be a witness. And it all depends on what comes out of his mouth right now, okay. So you may, those are your choices. I, I can have you, if you want to sit outside my door you can. If you want to sit in here. But I, please, please let me talk to him. Please let him finish his story.

    Mother:    Okay.

Doc. 1-3, pp. 45-46.[1] The interview continued, with no objection by Petitioner or his mother. At the end of the interview, Detective Brinkman asked to confirm that "you guys were advised of his rights and I gave you the opportunity to talk about this?" Ms. Thomas was initially silent, and Brinkman stated that she needed to answer out loud. Ms. Thomas then said, "Yes." Doc. 1-3, p. 54. Detective Brinkman testified at the hearing that Ms. Thomas gave her a hug and said thank you when Ms. Thomas left that night after questioning was completed. Tr. 205.

    Defense counsel questioned Detective Brinkman about Ms. Thomas' "I can't stand to hear any more of this" remarks and asked why Brinkman did not then end the interview. The detective said that she interpreted the mother's statements in the context that the mother was having "a very hard time listening to her son and the activity that took place that day" but was not asking her to stop the interview. The detective emphasized that Ms. Thomas never said that she wanted to terminate the interview, stop, or the like. "I felt like the onus was on her not on me." The detective added, "I do not feel like she asked to end

---

[1] This interview transcript, which is at the heart of the habeas issues, does not appear to be included in the certified complete copy of the state-court record filed by the State; there is no record reference to it in the State's brief, and the court has not found it in the state-court record. The interview recording was played at the suppression hearing but not transcribed by the court reporter. Fortunately, Petitioner filed a copy of a transcript, and the State has not challenged its accuracy. The Miranda waiver forms, introduced as exhibits at the suppression hearing and referred to throughout it, appear to be absent from filings by the State and Petitioner. Exhibits are often not included in the state-court record. That is understandable when an exhibit is not relevant to the habeas claims, but when a written or recorded confession, waiver form, photo lineup, lab report or the like bears directly on a habeas issue, it is inexcusable for the State to not include it in the habeas record or otherwise explain its absence. The State's brief should include record references to key evidence, testimony, and rulings, so the absence of critical parts of the record should become obvious as a brief is being written.

the interview." Tr. 188-90. It was also discussed that the mother sounded as if she was sighing and responding emotionally to hearing that her child was involved in or witnessed such a crime. Tr. 203.

Defense counsel stipulated that, other than the conversation quoted above, the recorded interviews did not include any interruption of the questioning by Petitioner or his mother that potentially asked police to stop the questioning. Defense counsel conceded that there was no such request reflected in the recordings, but he said that Ms. Thomas would testify that there was such an interruption. Tr. 158-59.

Ms. Thomas testified that she twice asked to stop the interview so that she could retain a lawyer. Tr. 229-30. The prosecutor played the recording of the quoted "I can't stand to hear any more of this" remarks by Ms. Thomas and asked if that was where she asked to cease the interview. Ms. Thomas said that she was "not sure if it was at that time." She later testified that she did not ask that her son be allowed to remain silent throughout that particular interview. Tr. 249-51.

The court heard argument on the motion. Defense counsel stated that he had three parts of his argument, and the first of them focused on the "I can't stand to hear any more of this" remarks quoted above and counsel's contention that it was an invocation of the right to remain silent. Counsel read the transcript and urged that the court could "infer" that Ms. Thomas clearly wanted the interview to end. He characterized Ms. Thomas' statements as a request to terminate the interview during the first interview on October 12, approximately midway through, and urged that any statements made by Petitioner after that moment should be suppressed as a violation of his right to remain silent. Tr. 269-73.

Page 9 of 18

Judge John Robinson noted that Ms. Thomas was a high school graduate and was then taking college courses, and Petitioner had been an A/B high school student. The court found that, considering their educational background and the forms that were provided and read to them, Petitioner and his mother were well aware of the <u>Miranda</u> rights. He noted that item three on the <u>Miranda</u> rights form asked Ms. Thomas if she had discussed with her son the fact that he had the right to refuse to answer questions.

The judge said that the "main issue" concerned Ms. Thomas' remarks that counsel argued were sufficient to require the detective to terminate the interview. He explained that he copied the relevant pages of the interview transcript to review, and he listened closely to the audio recording of the interview to try to pick up any inflection from Ms. Thomas' voice to reach a proper interpretation of her remarks. He said that he had the same reaction as Detective Brinkman and viewed Ms. Thomas's comments as indicating that she was emotionally overwhelmed, wanting to help her son, but not being able to stand to hear any more about the crime. The judge noted that whatever emotional crisis Ms. Thomas was suffering at that point seems to have been resolved a few pages later where she began to participate in the questioning. Based on these findings, the judge denied the motion to suppress. Tr. 285-89.

**The Appeal**

Defense counsel argued on appeal that the trial court erred when it denied the motion to suppress. The assignment of error argued that the confession was the product of fear, duress, intimidation, menaces, threats, inducements, and/or promises. The body of the brief also urged that it was wrong for the interrogation to continue "after his mother

requested that all questioning stop" so that she could retain an attorney. Tr. 1062. The appellate court's discussion of the challenge to the suppression ruling acknowledged the argument that interrogations continued after Petitioner's mother requested that questioning stop. The court discussed Ms. Thomas' expression that she did not want to hear any more questioning, which was followed by her agreement that Petitioner could finish telling his story. The court determined that the State had demonstrated that the statements were free and voluntary, made with an understanding waiver of Miranda rights. State v. Thomas, 201 So.3d at 280-83.

Petitioner filed a pro se writ application to the Supreme Court of Louisiana as the final step in his direct appeal process. That application urged that the trial court erred when it denied the motion to suppress, but the application's argument was based solely on allegations of coercion and threats. Petitioner did not include the argument that his mother invoked his right to silence during the course of the interview. Doc. 7-2, pp. 50-58. The court denied the writ application.

**The Post-Conviction Application**

Petitioner argued in his post-conviction application that the trial court wrongly denied his motion to suppress. This time, his argument focused on the contention that his right to cut off questioning was not scrupulously honored. Perhaps anticipating an objection that the claim was repetitive because it had been decided on appeal, Petitioner acknowledged that the trial court's ruling on the motion to suppress was challenged on appeal, but he contended that the particular "cut off questioning" issue he raised in his post-conviction application was not litigated. Doc. 7-2, pp. 60-63. He made related claims that

counsel rendered ineffective assistance at trial and on appeal by not gaining suppression of his statements based on the "cut off questioning" suppression argument.

The trial court disagreed with Petitioner's characterization of his claim as a new argument. It referred to La. C. Cr. P. art 930.4(A), which prohibits the consideration of a post-conviction claim that was fully litigated on appeal. The court determined that the appellate court had affirmed the denial of the motion to suppress, which barred the claim from post-conviction review. The court added that the ineffective assistance of counsel claims were denied because counsel had raised and litigated the "cut off questioning" issue, albeit unsuccessfully. Doc. 7-2, pp. 70-71. The state appellate court summarily denied a writ application, with reference to Article 930.4. p. 120. The Supreme Court of Louisiana summarily denied a writ application, but offered a brief finding that Petitioner failed to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 104 S.Ct. 2052 (1984). pp. 143-44.

**Habeas Claim: Denial of the Motion to Suppress**

Petitioner's habeas argument focuses on the alleged mid-interview invocation of his right to silence. The Miranda decision requires that a suspect in custody be advised, prior to any questioning, that he has the right to remain silent and that anything he says can be used against him in court. The evidence shows that this right was afforded, and Petitioner does not argue to the contrary. Miranda adds, "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda v. Arizona, 86 S.Ct. 1602, 1627 (1966). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent

depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 96 S.Ct. 321, 326 (1975).

In Davis v. U.S., 114 S.Ct. 2350 (1994), the Court addressed the clarity with which a suspect must invoke the Miranda right to *counsel* before police must end questioning. He must do so unambiguously. If he makes a statement concerning the right to counsel that is ambiguous or equivocal, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his Miranda right. A statement is either a request for counsel or it is not. "Maybe I should talk to a lawyer" was not. Id. at 2355-56.

The Court adopted that same standard with respect to the invocation of the right to remain silent in Berghuis v. Thompkins, 130 S.Ct. 2250 (2010). It reasoned that the requirement of an unambiguous invocation of Miranda rights results in an objective inquiry. The suspect in Thompkins refused to sign the Miranda waiver form but verbally confirmed that he understood his rights. He was then largely silent during almost three hours of interrogation, giving only a few limited answers such as yeah, no, or I don't know. Near the end, however, he made an incriminating statement regarding a murder. He argued that he had earlier invoked his Fifth Amendment right to remain silent, requiring police to end the interrogation before he made the incriminating statement. The Court stated that he did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made such a simple, unambiguous statement, he would have invoked his right to cut off questioning. His limited responses to questions, however, did not unambiguously invoke his right to remain silent.

Defense counsel specifically argued in the trial court that Petitioner's right to silence was invoked mid-interview by his mother's statements. The argument was denied after a detailed hearing and a thoughtful and well-reasoned opinion by the trial judge. On appeal, counsel's brief focused more on the related argument that the statements were the product of coercion, but the brief also argued that the right to silence was violated when questioning did not cut off after the mother's remarks. The silence-invocation issue was then addressed in the appellate court's opinion. This claim was, therefore, adjudicated on the merits by the state court.

Because of that state-court merits adjudication, habeas relief is available only if that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. Williams v. Taylor, 120 S.Ct. 1495, 1519-20 (2000). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

It is not enough for a federal court to disagree with the state court decision. Rather, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011). Applying this standard does not require that there be an opinion from the state court explaining its reasoning. Even when a claim is summarily denied, the petitioner still must meet his burden "by showing there was no reasonable basis for the state court to deny relief." Id. at 784.

The state court's decision of this claim in entirely consistent with Berghuis v. Thompkins. Ms. Thomas said that she could not stand to hear any more and was ready to get away if her son was going to jail. She did not, however, ever say that the interview was over, that her son was done answering any question, or make any similar unambiguous invocation of the right to remain silent. The detective was not under an obligation to ask questions to explore any ambiguous invocation. At the end of the discussion, the detective asked that Ms. Thomas let her son finish his story, and Ms. Thomas said, "Okay." She then participated in the interview, asked her own questions of the detective about the meaning of homicide, and agreed at the end that she and her son had waived his Miranda rights. There is no basis under the deferential standard of Section 2254(d) to grant habeas relief with respect to this issue.

Even if the Section 2254(d)'s relitigation bar did not apply, Petitioner would need to show under a *de novo* review standard that he is in custody in violation of the Constitution. Langley v. Prince, 926 F.3d 145, 163 (5th Cir. 2019). The state court's denial

of this claim was correct under even *de novo* review, so habeas relief is necessarily unavailable. Thompkins, 130 S.Ct. at 2264 (courts can "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies").

**Habeas Claim: Ineffective Assistance of Counsel**

To prevail on a claim of ineffective assistance of trial counsel, Petitioner must establish both that (1) his counsel's performance fell below an objective standard of reasonableness and (2) had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). To prevail on his claim that counsel rendered ineffective assistance on appeal, Petitioner must show that counsel omitted an issue that should have been argued, and there is a reasonable probability that he would have won on appeal had the argument been made. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner raised his ineffective assistance claims in his post-conviction application. The trial court and Supreme Court of Louisiana specifically stated that the claims lacked merit. Because the claims were adjudicated and denied on the merits by the state court, the federal court may not grant habeas relief unless the state court decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed). This standard "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state

proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Harrington, 131 S.Ct. at 786.

The state court's denial of Petitioner's ineffective assistance of counsel claims was not unreasonable. Trial counsel dedicated a significant portion of the suppression hearing to questions concerning whether Petitioner's mother invoked the right to cut off questioning, and counsel made a vigorous argument in support. The trial court did not agree, but counsel's efforts were admirable. The same attorney represented Petitioner on appeal. He devoted less attention to this particular aspect of his appellate challenge to the suppression ruling, but the argument was presented to and considered by the appellate court. There is no basis to believe that had counsel made more lengthy arguments on appeal regarding the "cut off questioning" issue that the appellate court would have overturned the conviction. For the reasons stated above, the underlying issue lacks merit due to the lack of an unambiguous invocation of the right to be silent and cut off questioning. Habeas relief may not be granted on this final claim. Moore v. Vannoy, 968 F.3d 482 (5th Cir. 2020) (lack of merit in underlying Batson claim precluded a showing of prejudice on habeas claim of ineffective assistance of appellate counsel).

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an

extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 17th day of April, 2023.

Mark L. Hornsby
U.S. Magistrate Judge